UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRUCE O. THOMPSON,

        Plaintiff,

v.                                 Case No. 8:05-cv-1316-T-24TGW

CITY OF SEMINOLE CITY COUNCIL,

        Defendant.

_____/

## ORDER

This cause comes before the Court on Defendant City of Seminole City Council's ("the City") Motion for Summary Judgment. (Doc. No. 33.)  Plaintiff Bruce O. Thompson, who is proceeding pro se, has filed a Response.[1]  (Doc. No. 39.)

## I.    Facts and Procedural History

Thompson was hired by the City as a firefighter/EMT in May of 1991, and held that position until his termination in December of 2004.  (Thompson dep., p. 11-12).  The events that led to Thompson's discipline and ultimate termination began on Thursday, October 14, 2004.  (*Id.* at 34.)  That evening, Thompson and a co-worker, Robert Williams, a fellow firefighter/paramedic, were together at O'Malley's Bar in Seminole, Florida.  (*Id.* at 34-35).  The two were "venting" to one another about difficulties that they had been having with their

---

[1]Although Thompson did not file any exhibits in support of his Response, he did file deposition transcripts and other exhibits with his Second Amended Complaint.  (Doc. Nos. 17, 18.)  The Court has considered these filings, as well as all other evidence filed by both parties throughout the case in ruling on this motion, as the Court is obligated to "consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties."  *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1519 (11th Cir. 1990).

significant others–Thompson was separated from his wife, and Williams was having troubles with his girlfriend.  (*Id.* at 37.)  During this conversation, Thompson revealed to Williams that he loved another man–Williams.  (*Id.*)  Thompson told Williams "I love you" and "I'll do anything with you."  (*Id.* at 38.)

Thompson then began telling Williams about his suicidal ideations–his thoughts of "taking a shotgun and blowing [himself] all over Training Chief Leland Greek's window because [Greek] had humiliated [Thompson] a year earlier, and it just every day kept bothering [him]."  (*Id.* at 39-40.)  Thompson went on to tell Williams that he had contemplated suicide a month earlier, after Williams told Thompson about a girl that Williams had spent some time with.  (*Id.* at 47-51.)  Williams was "shocked" by Thompson's statements, making no comment in response.  (*Id.* at 50-51.)

The following day, Friday, October 15, 2004, Thompson reported to duty.  (*Id.* at 54.) When he did not see Williams at work, Thompson tried to contact him.  (*Id.* at 55-56.) Thompson called Williams twice on Saturday, October 16, and once on Sunday, October 17. (*Id.* at 56.)  Thompson also drove to Williams' house on Saturday and left on Williams' doorstep two bottles of liquor and two bottles of soda, accompanied by a note saying "Cheers!"  (*Id.*) Thompson did this as a gesture to indicate that he wished to "sit down and have a drink together, and if there is any differences [to] settle them and stay friends."  (*Id.* at 56-57.)

When Thompson reported to work on Monday, October 18, 2004, Lt. Richard Schomp, Union President, asked Thompson to come to the training room to meet with him, as Williams had reported to Lt. Schomp what had occurred at O'Malley's Bar over the weekend.  (*Id.* at 54-55, 58-59.)  Lt. Schomp asked Thompson about the suicidal ideations, as well as the affectionate

2

remarks towards Williams, the phone calls, and the liquor.  (*Id.* at 58-61.)  Thompson told Lt.

Schomp that he was having a difficult time dealing with his feelings of love for another man.

(*Id.* at 60.)

After the meeting with Lt. Schomp, Thompson and Lt. Schomp met with Chief Graves

and Assistant Chief Wallace.  (*Id.* at 62.)  Chief Graves explained that he was concerned about

Thompson's thoughts of suicide and the comments regarding Chief Greek.  (*Id.* at 63.)

Thompson worked in an office connected to Chief Greek's office, and Chief Graves wanted

assurance that Thompson would not harm him.  (*Id.* at 63.)  The Chief requested a note from

Thompson's psychotherapist to ensure the safety of Thompson and his co-workers.  (*Id.* at 63-

64.)  Chief Graves and Lt. Schomp provided letters to his therapist to inform the therapist of the

recent circumstances and to request an assessment of any danger Thompson may pose and

whether Thompson should be allowed to continue working while being treated.  (*Id.* at 90-92;

Chief Graves Aff. at ¶ 3, Ex.1; Lt. Schomp Aff. at ¶ 6, Ex.1.)

Additionally, Chief Graves and Assistant Chief Wallace discussed the City's prohibition

against sexual harassment and the fact that Thompson's actions were in violation of Personnel

Policy and Procedure 1.07, Sexual Harassment Prohibited.[2]  (Thompson dep., p. 65-66.)

Assistant Chief Wallace explained to Thompson that his behavior on October 14, 2004, and over

the following weekend was in violation of the policy, specifically the portion of the policy that

prohibits sexual harassment that "has the purpose or effect of interfering with work performance,

---

[2]That provision reads as follows: "Sexual harassment means unwelcome sexual advances, request(s) for sexual favors, and other verbal, written, or physical conduct of a sexual nature when such conduct is made explicitly or implicitly a term or condition of employment, is used a basis for employment decisions, or has the purpose or effect of interfering with work performance, or creating an otherwise offensive work environment."  (Thompson dep., Ex.2.)

or creating an otherwise offensive work environment." (*Id.*)  Assistant Chief Wallace and Lt. Schomp informed Thompson that he would be receiving a reprimand for his violation of these policies, and instructed him to stay away from Williams.  (*Id.* at 70-73.)  The formal Written Reprimand was given to Thompson on October 21, 2004.  (*Id.* at Ex.2.)

On October 29, 2004, Thompson again drove by Williams' home in order to see him. (*Id.* at 75.)  Thompson explained, "I was very confused about what was happening between Mr. Williams and I. . . . [H]e didn't return my calls from that weekend, and I got a reprimand, and I just . . . didn't understand." (*Id.* at 76.)  Thompson says his goal was to see Williams' face and to see what kind of reaction Williams would have when he saw Thompson.  (*Id.*)  Thompson did not see Williams; however, Williams did see Thompson and reported to Lt. Schomp that he had driven by his house.  (*Id.* at 76-77, Ex.4.)

That afternoon, on October 29, Thompson was called to meet with Assistant Chief Wallace and Chief Graves.  (*Id.* at 80.)  Chief Graves notified Thompson that he was charged with again violating Personnel Policy and Procedure 1.07, Sexual Harassment Prohibited, as well as City of Seminole Fire Rescue Department Rules and Regulations, Level III Offenses 3.b.16[3] for driving by Williams' home that morning.  (*Id.* at 80-81, Ex.4.)  Additionally, he was charged with violating Rules and Regulations Level III Offense–V.D.3.b.3–Insubordination, for "refus[ing] to comply with, or disregard for, any assignment, order, or instruction, verbal or written, given by a Manager." (*Id.* at Ex.4.)  Thompson was suspended with pay pending a Pre-Disciplinary Hearing to be conducted on Friday, November 5, 2004.  (*Id.* at 85, Ex.4.)

---

[3]That provision prohibits the following: "Intentional discrimination or substantiated sexual harassment, ethnic/racial slurs or immoral conduct on or off the job, which would interfere with the employee's ability to maintain the public's trust." (*Id.* at Ex.4.)

4

On November 4, 2004, however, Thompson signed a written waiver of his right to the Pre-Disciplinary Hearing and accepted a suspension without pay of ten consecutive work periods, a one-year probationary period, a psychological Fitness-for-Duty examination, and agreed to "[s]tay away from Firefighter Robert Williams while off duty and maintain limited contact while on duty." (*Id.* at 81-82, Ex.4.) Before signing the waiver, however, Thompson asked for clarification of what it meant to "stay away" from Williams.[4] Furthermore, he told Lt. Schomp and Chief Graves that he would waive his right to the hearing under the condition that only another violation of the sexual harassment policy would subject him to further discipline. (*Id.* at 82, Ex.4.) The following stipulation was included in the written waiver: "I also understand that any additional infractions of the City of Seminole Fire Rescue Department Rules and Regulations or the City of Seminole Policies and Procedures related to the charges brought in the Pre-Disciplinary Hearing Memo dated October 29, 2004 will result in termination." (*Id.*) Thompson was scheduled to return from his suspension on November 19, 2005. (*Id.* at 105-106.)

While on suspension, Thompson spoke to Lt. Schomp and Assistant Chief Wallace. (*Id.* at 130-31, 137.) Thompson informed them that he "would not like to be acting lieutenant, at least for a while." (*Id.* at 130, 137.) He explained that the position "stress[ed] [him] out." (*Id.* at 131.) Thompson said that, in an "extreme emergency" when there is no one else for the position, he would do it. (*Id.*) He further explained that he "had a hard time making decisions, which is required of that job, and [his] depression cause[d] [him] not to be able to make

---

[4]For example, Thompson asked what he should do if he is at a restaurant and Williams walks in. (*Id.* at 84.) Thompson was told that, in such a situation, he should get up and leave. (*Id.*)

5

decisions." (*Id.*) Lt. Schomp and Assistant Chief Wallace told him that was "no problem." (*Id.* at 137.)

On November 11, 2004, during his suspension, Thompson was given a psychological fitness-for-duty evaluation by Dr. Sheehan. (*Id.* at 87.) Dr. Scheehan diagnosed him with major depression, social anxiety disorder, and alcohol abuse. (*Id.* at 88.) Dr. Sheehan recommended additional medication and cleared Thompson for duty. (*Id.*; Graves aff., Ex. 2.)

Also during his suspension, Thompson visited Lakeside Medical Center for a shoulder injury. (Thompson dep., p. 104-05.) Since October 6, 2004, Thompson had been working a light duty assignment due to the injury, which occurred on August 31, 2004. (*Id.* at 28-29, 32.) On November 14, 2004, Thompson was given a full release for his shoulder and was cleared to return to regular duty by Dr. Sena at Lakeside Medical Center. (*Id.* at 27, 105; Graves aff., Ex.3.)

At the conclusion of his disciplinary suspension, on November 19, 2004, Thompson returned to work with medical clearance to return to full duty without restrictions from Dr. Sheehan and from Dr. Sena at Lakeside Medical Center. (Thompson dep., p. 88, 104-06.) On the date of his return, Thompson met with District Chief Mark Blackburn and Lt. Thomas Winkler, command staff on his new shift. (*Id.* at 138.) The two had been informed of his request to avoid serving as acting lieutenant. (*Id.*) Thompson said, "Yes. I asked for that, and I would appreciate it very much if you didn't put me there unless in an extreme emergency I will do it. But please don't put me in acting lieutenant." (*Id.* at 138-39.) The two said that was "[f]ine." (*Id.* at 139.) However, during the month of December while other lieutenants were out on leave, Thompson was made acting lieutenant for six out of the seven shifts that he worked.

6

(*Id.* at 131-32, 136.)   When he was made acting lieutenant for these shifts, Thompson never questioned the assignment.  (*Id.* at 136, 142.)

On December 22, 2004, Thompson was serving as Acting Lieutenant on a shift with Shannon "Jake" Busche and Matthew Kelleher.  (*Id.* at 107, 109.)  The three responded to a call and met a paramedic on the scene who was from Costa Rica.  (*Id.* at 109-10.)  On the return to the fire station, Thompson remarked that Costa Rica would be a great country to live in.  (*Id.*)  Busche and Kelleher started harassing Thompson about being "un American," joked that they were going to buy Thompson a one-way ticket to Canada, and told him to "get the hell out of here."  (*Id.* at 109-10.)  In response, Thompson "just lost it."  (*Id.* at 109.)  He was angry, and he "was not in control."  (*Id.* at 110.)  Thompson started screaming "Shut the fuck up!"  (*Id.*)  He screamed it approximately eight times.  (*Id.*)

When the three returned to the fire station, Thompson called Lt. Schomp and asked him to come down to talk to him.  (*Id.* at 116.)  After speaking with Thompson about the incident, Lt. Schomp talked to Busche and Kelleher.  (*Id.*)  Thompson had asked to go home because he had a headache, and following Lt. Schomp's discussion with Busche and Kelleher, Lt. Schomp returned to Thompson and told him to go home.  (*Id.*)

The following day, on December 23, 2004, Thompson received phone messages directly from Chief Graves and Lt. Schomp, who both asked that he call Lt. Schomp.  (*Id.* at 117.)  Thompson did not answer the messages.  (*Id.*)  The following day, on December 24, 2004, both Chief Graves and Lt. Schomp left messages again.  (*Id.*)  Thompson later returned the call from Lt. Schomp, who informed him that he was going to be terminated.  (*Id.*)  Chief Graves also wrote Thompson a memorandum explaining that he was terminated "[a]s a result of [his] actions

on December 22, 2004, in which Acting District Chief Richard Schomp was compelled to relieve [him] from duty, and because [he] was on probation caused by [his] previous inappropriate actions." (*Id.* at 118, Ex.5.)

On July 14, 2005, Thompson initiated this suit by filing a one paragraph complaint, alleging that the City and the International Association of Firefighters Local 2896[5] violated his rights under the Americans with Disabilities Act and the Florida Civil Rights Act. (Doc. No. 1.) The defendants moved to dismiss that complaint for failure to satisfy the pleading requirements set forth in the Federal Rules of Civil Procedure. (Doc. Nos. 5, 6, 12, 13.) In denying those motions, the Court concluded that it was virtually impossible to know which of Thompson's allegations of fact were intended to support which claims for relief. (Doc. No. 16.) However, because Thompson is proceeding pro se, the Court twice permitted him to amend his complaint, specifically instructing him to state what law he is relying on, which defendants violated that law, and what facts he is relying on to support his claims. (*Id.*)

On April 28, 2006, Thompson filed his Second Amended Complaint. Again, this version of the complaint is difficult to follow, as it contains a lengthy narrative of grievances against the City, combined with haphazard citations to caselaw. To the best the Court can discern, Plaintiff is attempting to assert seven causes of action against the City.[6] (Doc. No. 17.) In Count One,

---

[5]Thompson's claims against International Association of Firefighters Local 2896 were later dismissed with prejudice, and therefore, those claims are no longer before this Court. (Doc. No. 24.)

[6]Thompson's response in opposition to the summary judgment motion is similarly disjointed and confusing, as he attempts to assert a multitude of claims against the City, many of which are not referenced in his EEOC charge or his several complaints. In considering all of those claims, the Court has allowed Thompson the "wide latitude" generally afforded pro se litigants, but addresses in this Order only those claims that warrant discussion. *SEC v. Elliott*, 953 F.2d 1560, 1582 (11th Cir. 1992).

Thompson alleges that the City terminated his employment because of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102 ("ADA").  In his response to the summary judgment motion, Thompson also alleges that the City failed to accommodate his disability by placing him in the Acting Lieutenant position on several occasions despite his request not to serve in that role.  In Count Two, he alleges that the City terminated his employment because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq. ("ADEA").  In Count Three, he alleges that the City terminated his employment because of his gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII"), and the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq ("FCRA").  In Count Four, he alleges that the City terminated his employment and thereby violated his rights to "non-discriminatory treatment and proper hearings" in violation of the Firefighter Bill of Rights, Fla. Stat. § 112.80 et seq.  In Count Five, he alleges that the City violated his due process rights and right to privacy under the Fourteenth Amendment by making "punitive decisions against [him] before he could speak."  Finally, in Count Six, he alleges that the City terminated his employment in retaliation for him filing for workers' compensation benefits, in violation of Florida Statute § 440.205.

## II.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See id.* When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.*

### III.    Discussion

#### A.    Disability Discrimination based on Termination

In Count One, Thompson alleges that the City terminated his employment because of his disability in violation of the ADA. To evaluate this type of disparate treatment claim supported by circumstantial evidence, the Court uses the traditional *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), burden-shifting analysis. Under this framework, the plaintiff must raise an inference of discrimination by establishing a prima facie case of discrimination. *Id.* at 802, 93 S. Ct. at 1824. The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. *Id.* Once the defendant produces such a reason, the plaintiff must then prove that the legitimate reason was a mere pretext for discrimination. *Id.* at 804, 93 S. Ct. at 1826. To avoid summary judgment, the plaintiff must produce sufficient evidence to show "that the employer intentionally discriminated against [her] because of [her] [protected characteristic]." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam).

The ADA prohibits employers from discriminating against a qualified individual because of a disability. 42 U.S.C. § 12112(a). To establish a prima facie case of disability

discrimination, a plaintiff must establish that: (1) he had a disability within the meaning of the ADA; (2) he was a "qualified individual," which is to say that he could perform the essential functions of his job with or without a reasonable accommodation; and (3) he was discriminated against because of his disability. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *D'Angelo v. Conagra Foods*, 422 F.3d 1220, 1226 (11th Cir. 2005). The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "[M]ajor life activities" are defined as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Upon review of the entire record, it is still unclear what Thompson's alleged disability is. When asked to identify his disability, Thompson initially stated "depression." (Thompson dep., p. 15.) Later, he asserted that his injured shoulder was the basis for discrimination. (*Id.* at 18-19.) Then, he asserted that he was not disabled at all but that the City regarded him as having a mental instability. (*Id.* at 127.) Thompson has failed to establish that any one of these alleged impairments qualifies as a "disability" within the meaning of the ADA.

Thompson has failed to establish that his depression or shoulder injury substantially limited him in one or more major life activities. When asked to identify which, if any, major life activities were substantially impaired by his depression, Thompson testified that his depression impacted his ability to make decisions and to concentrate when he served in the role of Acting Lieutenant. (*Id.* at 129-30.) The Eleventh Circuit Court of Appeals has not expressly addressed whether making decisions or concentrating constitute major life activities, although several other

11

courts have held that concentration is not a major life activity itself, but may be considered a component of a major life activity, such as working.  *Robinson v. Hoover Enters. LLC*, 2004 U.S. Dist. LEXIS 25375, No. 03-2565, at \*17, n.5 (N.D. Ga. Oct. 20, 2004) (listing courts that have held that concentration is not a major life activity).  However, even assuming that making decisions and concentrating qualify as major life activities, Thompson failed to present any evidence to establish that he had an objectively reasonable belief of substantial limitation in those areas.  Although Dr. Sheehan diagnosed Thompson with depression, Dr. Sheehan cleared him for full duty, without restriction following a psychological fitness-for-duty evaluation on November 11, 2004.  Furthermore, when asked in his deposition if he was capable of doing the job of Acting Lieutenant, Thompson responded, "I offered to do it. . . ."  Accordingly, the results of the fitness- for-duty evaluation and Thompson's own testimony demonstrate that he did not have an objectively reasonable belief that he was substantially limited in a major life activity.  "Simply relying on a physician's conclusion of disability cannot substantiate a finding of disability, nor an objectively reasonable belief of the same."  *Id.* at \*17.

Likewise, Thompson's injured shoulder does not constitute an actual disability within the meaning of the ADA because he failed to identify any major life activity that was substantially limited by the injury in a severe and permanent manner.  See *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S. Ct. 681, 791, 151 L. Ed. 2d 615 (2002) (holding that to be substantially limited, the impairment must be permanent or long-term) (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)).  Indeed, Thompson was released to regular duty without restriction by Dr. Sena on November 14, 2004, a few short months after the date of his injury on August 31, 2004.

Thompson's claim that the City regarded him as disabled similarly fails.  A person is

regarded as having an impairment if he (1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though he does; (2) has an impairment that substantially limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a substantially limiting impairment.  29 C.F.R. § 1630.2(l).  Thompson has not identified which major life activity he believes the City perceived him as substantially limited in his ability to perform.  However, assuming that he is alleging that the City perceived him to be substantially limited in his ability to work, that claim must fail.  "Being regarded as unable to perform only a particular job . . . is insufficient, as a matter of law, to prove that the plaintiff is regarded as substantially limited in the major life activity of working."  *Collado*, 419 F.3d at 1157 (quotations, citations, and alterations omitted).  Thompson must prove that the City considered him "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes."  29 C.F.R. § 1630.2(j)(3)(I).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Thus, an impairment must be perceived to preclude an individual from more than one type of job, even if the job foreclosed is the individual's job of choice."  *Id.* (quotations, citations, and alterations omitted).

There is no evidence that the City regarded Thompson as substantially limited from any job, much less from a class or broad range of jobs.  To the contrary, the record shows that the City continued to employ Thompson at full duty and asked him to serve as Acting Lieutenant several times after he returned from suspension.[7]

_____

[7]The Court declines to consider the City's argument that Thompson was not otherwise qualified to perform his job to the extent that he was not able to work with others because that

Likewise, Thompson did not sustain his burden of showing that the City terminated his employment because of his disability.  The record is void of any evidence of discriminatory intent based on disability or any other protected characteristic.  Instead, the record reflects that the City terminated Thompson pursuant to the City's progressive discipline policy after he engaged in inappropriate behavior towards subordinates, repeatedly cursing and screaming at them.  Accordingly, the City is entitled to summary judgment on Thompson's disability discrimination claim because he has failed to present sufficient evidence to raise an issue of fact concerning his prima facie case.[8]

### B.      Failure to Accommodate

In his response to the summary judgment motion, Thompson also argues that the City failed to accommodate his disability by placing him in the Acting Lieutenant position on several occasions despite his request not to serve in that role.  The *McDonnell Douglas* burden-shifting analysis is not applicable to such a claim.  *Nadler v. Harvey*, 2007 U.S. App. LEXIS 20272, No. 06-12692, at * 28-29 (11th Cir. Aug. 24, 2007).  Instead, the court considers whether the plaintiff

---

argument was not fully briefed by the parties.

[8]Furthermore, even if Thompson established a prima facie case of disability discrimination, summary judgment is appropriate because he failed to prove that the City's legitimate, nondiscriminatory reason for terminating him–his repeated misconduct–was pretextual.  Although Thompson contends that his behavior was not in violation of any policy, he fully admits that he engaged in the conduct.  He asserts that he did not violate his probation because the final infraction was unrelated to a violation of the sexual harassment policy.  The Court's inquiry, however, is "limited to whether the employer gave an honest explanation of his behavior."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  The City has offered an honest explanation for the termination, and Thompson cannot raise an inference of pretext by quarreling with the wisdom of that decision.  *See Willis v. Conopco., Inc.*, 108 F.3d 282, 287 (11th Cir. 1997) (ruling that summary judgment was proper when the plaintiff failed to offer evidence to raise an inference that the defendant's articulated explanation for her termination was pretextual).

Case 8:05-cv-01316-SCB-TGW   Document 41   Filed 09/26/07   Page 15 of 25 PageID 444

has shown that he is an otherwise qualified disabled individual within the meaning of the ADA, and whether the defendant has failed to provide a reasonable accommodation. *Id.* If so, "the defendant must provide a reasonable accommodation unless he can assert an undue hardship as an affirmative defense." *Id.* (citing *Willis*, 108 F.3d at 286).

As stated previously, Thompson has not established that he is an "otherwise qualified disabled individual" because he is not "disabled" within the meaning of the ADA. Furthermore, Thompson has not met his burden of showing that he was a qualified individual because he has not shown that his proposed accommodation–to not serve as Acting Lieutenant–would enable him to perform the essential functions of his job as a firefighter/EMT. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1256 (11th Cir. 2007). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition not a qualified individual and, therefore, not covered under the ADA." *Id.* (quotations and citations omitted). Although the ADA "may require an employer to restructure a particular job by altering or eliminating some of its marginal functions," the employer is not required to eliminate the essential function of the plaintiff's job. *Id.* (quotations and citations omitted). The undisputed record reflects that it was part of Thompson's duty as a firefighter/EMT to serve as Acting Lieutenant on certain shifts and was not a marginal function of the job.[9]

---

[9]The Court concludes that summary judgment is appropriate on Thompson's failure to accommodate claim for the additional reason that Thompson failed to exhaust his administrative remedies for this claim before filing suit. The allegations in Thompson's EEOC charge were limited to improper termination based on disability and age. (Doc. No. 17, Ex.1.) Thompson did not make any reference to the fact that the City required him to serve as Acting Lieutenant, nor did he allege that the City failed to accommodate him. An ADA claim based on termination involves a theory of liability and elements of proof that are separate and distinct from an ADA failure to accommodate claim. Therefore, his failure to accommodate claim exceeded the scope of his EEOC charge. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) (stating that the

C.        Age Discrimination

In Count Two, Thompson alleges that the City terminated his employment because of his age in violation of the ADEA.  The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1).  Under the ADEA, "the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105 (2000).  Courts apply the *McDonnell Douglas* burden-shifting framework to analyze circumstantial cases of age discrimination under the ADEA.  *See id.* at 142, 120 S. Ct. at 2106; *Chapman*, 229 F.3d at 1024.

1.        Thompson's Prima Face Case

To establish a prima facie case of age discrimination under the ADEA, the plaintiff must show that (1) he is a member of the protected age group; (2) he was subjected to an adverse employment action; (3) he was replaced by someone outside the protected group; and (4) he was qualified for the position from which he was terminated.  *Chapman*, 229 F.3d at 1024.

Here, the City does not dispute that Thompson is a member of the protected class, that his employment was terminated, and that he was replaced by someone outside of the protected class.  However, the City does argue, albeit in a conclusory fashion, that Thompson was not qualified for the position as a firefighter because he was unable to work effectively with his co-workers.  The City does not cite any authority to support its position that a plaintiff's inability to

allegations in the judicial complaint and the elements proof must be "reasonably related" to the EEOC charge, such that there are "no material differences" between them).

16

work effectively with others renders him disqualified for purposes of a prima facie case of age discrimination.  Thompson did not respond to this argument.  Because the parties do not fully argue the merits of Thompson's qualification, the Court declines to rule on this issue and assumes that a prima face case of age discrimination was established.

### 2.    The City's Legitimate, Non-Discriminatory Reason

Assuming Thompson established a prima facie case, a presumption of discrimination arises and the burden shifts to the City to proffer a legitimate, non-discriminatory reason for terminating Thompson. *Chapman,* 229 F.3d at 1028.  The City again proffers that Thompson's repeated misconduct led to his termination.  The City's burden is merely one of production, not persuasion.  *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003) (per curiam). The City's proffered reason would eliminate the presumption of discrimination and shift the burden to Thompson "to come forward with sufficient evidence to permit a reasonable factfinder to find that those reasons were prextual."  *Id.*

### 3.    Thompson's Evidence of Pretext

To establish pretext, Thompson disputes that he sexually harassed Williams or committed any type of misconduct.  (Doc. No. 39, p. 2-6.)  He asserts that the City never clearly explained to him the order requiring him to stay away from Williams.  (*Id.* at 9.)  Furthermore, he argues that the City chose to discipline him but not Busche or Kelleher (who are both under 40 years of age) for the December 22, 2004 incident, despite the fact that they were equally guilty of misconduct, in order to avoid paying his disability pension and higher salary.  (*Id.* at 13-14.)  Instead, Thompson argues, the City hired a younger, but unqualified employee, Leon Hammond, to replace him.  (*Id.*)  Finally, Thompson vaguely mentions that another, younger

17

employee, Hope Hengstenberg, was not disciplined for telling a co-worker that she loved him.
(*Id.* at 20.)

These arguments are insufficient to establish that the City's reason for terminating
Thompson's employment was pretextual.  "A plaintiff is not allowed to recast an employer's
preferred nondiscriminatory reasons or substitute his business judgment for that of the employer.
Provided that the proffered reason is one that might motivate a reasonable employer, an
employee must meet that reason head on and rebut it, and the employee cannot succeed by
simply quarreling with the wisdom of that reason." *Chapman,* 229 F.3d at 1030.  The Court will
not second-guess the City's judgment that Thompson's misconduct warranted termination, nor
will it question the City's decision not to discipline Busche or Kelleher, for an "employer may
fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no
reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio
Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984).  Thompson has not substantiated his argument
that the City terminated him to avoid paying his pension, or that the City elected not to discipline
a younger Hope Hengstenberg for the same conduct, with any evidence other than his own self-
serving accusations.  For that reason alone, summary judgment on Thompson's age
discrimination claim is appropriate.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th
Cir. 1990) ("To survive summary judgment, the plaintiff must . . . present concrete evidence in
the form of specific facts which show that the defendant's preferred reason is mere pretext.
Mere conclusory allegations and assertions will not suffice.").[10]

---

[10]Thompson also points to the fact that he received a favorable ruling from the Florida
Division of Administrative Hearings, Office of the Judges of Compensation Claims, on his claim
for temporary partial disability benefits.  On April 25, 2006, a judge ruled that Thompson's
conduct did not rise to the level of "misconduct"under Florida Statute § 440.02(18), and

D.      **Gender Discrimination**

In Count Three, Thompson alleges that the City terminated his employment because of

his gender in violation of Title VII and the FCRA.  The City agues that summary judgment

should be entered on Thompson's gender discrimination claim because he failed to exhaust his

administrative remedies.

"No action alleging a violation of Title VII may be brought unless the alleged

discrimination has been made the subject of a timely-filed EEOC charge."[11]  *Alexander v.*

*Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000).  "EEOC regulations provide that

charges should contain, among other things, '[a] clear and concise statement of the facts,

including pertinent dates, constituting the alleged unlawful employment practices.'" *Id.* (quoting

29 C.F.R. § 1601.12(a)(3)).  Although the courts liberally construe EEOC charges that are

prepared without the assistance of counsel, "a plaintiff's judicial complaint is limited by the

scope of the EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004);

*see Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("*Pro se* pleadings are

held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be

---

therefore, he qualified for the benefits.  (Doc. No. 17, Ex. 2 at 12.)  Although it is far from clear,
Thompson appears to be arguing this ruling supports his argument that he was improperly
terminated and demonstrates that the City's termination was pretexual.  The Court rejects that
argument because, as stated previously, the plaintiff may not "recast an employer's proffered
nondiscriminatory reasons or substitute [any court's] judgment for that of the employer."
*Chapman,* 229 F.3d at 1030.

[11]Decisions construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et
seq., are applicable when considering claims under the FCRA because the FCRA was patterned
after Title VII.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).
Furthermore, the same exhaustion requirements apply to both Title VII and FCRA claims. *Prieto
v. City of Miami Beach*, 190 F. Supp. 2d 1340, 1343 n.2 (S.D. Fla. 2002).

liberally construed.").

When Thompson filed his EEOC charge of discrimination, he alleged only discrimination based on his age and disability.  Nowhere on the charge, or the affidavit he submitted with the charge, does there appear a reference to gender discrimination.  (Doc. No. 17, Ex.1.)  Thompson only checked "age" and "disability" on the charge and left unchecked the box next to "sex." (*Id.*)  Both on the charge and in the affidavit, Thompson described his claim as a discrimination claim based only on age and disability.  (*Id.*)  Even construing these pleadings liberally, the charge and affidavit did not put the City on notice that Thompson was also alleging gender discrimination, and his gender claim could not reasonably be expected to grow out of his age or disability claims.  *See Jerome v. Marriott Residence Inn,* 211 Fed. Appx. 844, at *846-47 (11th Cir. 2006) (affirming dismissal of a disparate pay claim because the pro se plaintiff only alleged a denial of promotion claim in his EEOC charge); *Freese v. Wuesthoff Health Sys., Inc.*, No. 06-cv-175, 2006 U.S. Dist. LEXIS 31784, at *11-12 (M.D. Fla. May 19, 2006) (dismissing gender discrimination claim because plaintiff failed to make any allegations of gender discrimination in her EEOC charge).  Accordingly, because Thompson's gender discrimination claim was beyond the scope of his EEOC charge, the Court concludes that he failed to exhaust his administrative remedies, and summary judgment on this claim is appropriate.

### E.      Firefighter's Bill of Rights

In Count Four, Thompson alleges that the City violated his rights to "non-discriminatory treatment and proper hearings," which are rights allegedly guaranteed by Florida's Firefighters' Bill of Rights, Fla. Stat. § 112.80 et seq., when it terminated his employment.  (Doc. No. 17, p. 15.)  Pursuant to § 112.83, a firefighter who is "personally injured" by his employer's failure to

comply with the provisions of the Firefighters' Bill of Rights, "may apply directly to the circuit court of the county" where his employer is headquartered "for an injunction to restrain and enjoin [the] violation of the provisions of this part and to complete the performance of the duties imposed by this part." Although this statute allows a firefighter, such as Thompson, to sue for an injunction in a Florida circuit court, Thompson does not cite, nor is the Court aware of, any authority that interprets this statute to allow a firefighter to initiate such a suit in federal court. Furthermore, Thompson has failed to identify which right guaranteed by the Firefighters' Bill of Rights the City violated, nor did he demonstrate how such right was violated. Accordingly, any claim arising under this statute must fail.

  **F.**  **Due Process**

  In Count Five, Thompson appears to be asserting a claim arising under the Fourteenth Amendment that the City denied his right to due process and to privacy by making "punitive decisions against [him] before he could speak," by "NOT clearly explaining the termination cause," and by "[denying him] an opportunity for a disability pension." First, the Court notes that Thompson's failure to assert his due process claim under 42 U.S.C. § 1983 warrants dismissal of the claim.

  However, construing Thompson's complaint liberally, and assuming that he properly alleged the claim under 42 U.S.C. § 1983, such a claim fails because adequate state remedies were available to provide him with an opportunity for a hearing. In *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc), the Eleventh Circuit ruled that "only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." "It is the state's failure to provide adequate

procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). This rule provides the state the opportunity to "remedy the procedural failings of its subdivisions and agencies in the appropriate fora–agencies, review boards, and state courts–" before a plaintiff may assert a procedural due process claim. *McKinney*, 20 F.3d at 1560. "If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Cotton*, 216 F.3d at 1331. "[T]o be adequate, the state procedure need not provide all the relief available under section 1983," but instead "must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due." *Id.*

Thompson's due process claim fails because adequate state procedures were available to correct the alleged procedural deficiencies. Thompson could have filed a grievance against the City through a grievance procedure under his collective bargaining agreement. (Thompson dep., p. 45-47.) He also could have sued for an injunction in state circuit court, pursuant to his rights under the Firefighter Bill of Rights, as explained previously. Thompson's failure to pursue these adequate state remedies is fatal to his due process claim. *Cotton*, 216 F.3d at 1331.

## G.    Workers' Compensation Retaliation

Finally, in Count Six of Thompson's Second Amended Complaint, he contends that the City retaliated against him for filing a workers' compensation claim in September 2004. Florida Statute § 440.205 provides that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law." To prove a prima facie case of

retaliation under this law, Thompson must demonstrate that (1) he engaged in statutorily

protected activity; (2) an adverse employment action occurred; and (3) the adverse action was

causally related to the employee's protected activity.  *See Sierminski v. Transouth Fin. Corp.*,

216 F.3d 945, 950-51 (11th Cir. 2000).  To establish a causal connection, the plaintiff must show

that (1) the decisionmakers were aware of the protected conduct and (2) that the protected

activity and the adverse employment action were not wholly unrelated. *Gupta v. Fla. Bd. of

Regents*, 212 F.3d 571, 590 (11th Cir. 2000).  Retaliation claims brought under § 440.205 are

subject to the burden-shifting analysis applicable to Title VII retaliation claims.  *Humphrey v.

Sears, Roebuck & Co.*, 192 F. Supp. 2d 1371 (S.D. Fla. 2002).

Thompson alleges that the City retaliated against him by terminating his employment

after he filed for workers' compensation benefits.  Viewing the entirety of the record in the light

most favorable to him, the Court concludes that Thompson has failed to demonstrate a prima

facie case of retaliation.  Thompson testified that he filed a worker's compensation claim on

September 3, 2004, which was denied by the Florida League of Cities Insurance Company in late

September 2004.  (Thompson dep. at 23-24, 26, 122.)  He further testified that he appealed the

denial of his claim in December 2004 and that a court's website indicated that the City was

noticed of the claim on December 20, 2004, only a few days before he was terminated.  (*Id.* at

23.)  This testimony is insufficient to demonstrate a causal connection between Thompson's

filing of the workers' compensation claim and his subsequent termination because it does not

show that anyone at the City–much less, any decisionmaker–knew of the claim or that

Thompson had filed an appeal regarding the claim at the time of the termination.  The temporal

proximity between the appeal and the subsequent termination alone is insufficient to create a

genuine issue of fact as to a causal connection where there is no evidence that the decisionmaker knew at the time of the termination that Thompson had filed the claim or appealed its denial. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Furthermore, even assuming that Thompson established a prima facie case of retaliation, he has failed to present any evidence that the City's legitimate, non-discriminatory reason for his termination was pretextual. Thompson's only attempt at demonstrating pretext is his allegation in his Second Amended Complaint that when he was first hired in 1991 he was told, "don't file a Workers' Comp claim or you'll get fired." Thompson did not present any evidence to substantiate this self-serving allegation, such as when, where, or by whom the statement was made. "To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's preferred reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley*, 907 F.2d at 1081.

## IV.   Conclusion

In conclusion, viewing the entirety of the record in the light most favorable to Thompson, there are no genuine issues of material fact as to any of Thompson's discrimination or retaliation claims. Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment. The Clerk is directed to enter judgment in favor of the City and to close the case. The Final Pretrial Conference in this case that was scheduled for Tuesday, October 2, 2007, is cancelled, and this case is removed from the Court's November 2007 trial calendar.

**DONE AND ORDERED** at Tampa, Florida, this 26th day of September, 2007.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record